United States Court of Appeals
Fifth Circuit

**F I L E D**

May 23, 2003

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-40447

_____

KELSEY PATTERSON,                           Petitioner-Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(4:98-CV-156)

_____

Before JOLLY, JONES, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

Kelsey Patterson was convicted in the Texas courts of capital murder and sentenced to death, notwithstanding his claims of mental illness and incompetence.  The district court denied federal habeas relief, but granted a certificate of appealability ("COA") for Patterson's claims that he was incompetent to stand trial and that he received ineffective assistance of counsel at trial.  Patterson appeals the denial of habeas relief as to those two claims and, in addition, he seeks a COA from our court for his claims that he received ineffective assistance of counsel at the competency trial, that he is presently incompetent to be executed, and that the state

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

trial court should have conducted a mid-trial competency hearing. We AFFIRM the denial of habeas relief on Patterson's claims that he was incompetent to stand trial and that he received ineffective assistance of counsel at the guilt-innocence and punishment phases of trial; DENY a COA for Patterson's claims that counsel rendered ineffective assistance at the competency trial and that the trial court denied him due process by failing to conduct a mid-trial competency hearing; and GRANT a COA for Patterson's claim that he is presently incompetent to be executed, but DISMISS that claim, without prejudice to his raising it again when his execution is imminent and the claim thus becomes ripe.

I

Patterson has a long history of mental illness (paranoid schizophrenia). The murders for which Patterson was convicted and sentenced to death were preceded by earlier, non-fatal shootings. With no apparent rational motive, Patterson shot a co-worker in 1980 and was found incompetent to stand trial. Although his competency was restored after hospitalization and forcible medication, the charges were dismissed because he was insane at the time of the offense. In 1983, Patterson shot another co-worker, again with no apparent rational motive. Again, he was found incompetent to stand trial; his competency was restored after hospitalization and forcible medication; and the charges were dismissed because he was insane at the time of the offense. He was

2

admitted to a state mental hospital again in 1988 after threatening his family, but was released after being forcibly medicated.

In September 1992, Patterson shot and killed Louis Oates and Dorothy Harris. Consistent with his prior assaultive behavior, there was no apparent rational motive for the murders. After shooting the victims, Patterson walked back to his roommate's house, put the gun on the porch, told his roommate that he had just shot two people, and then removed all of his clothing and walked up and down the street in front of the house until he was arrested. He was charged with capital murder.

The trial court authorized funds for a defense psychiatric expert to examine Patterson for competency to stand trial and sanity at the time of the murders. After examining Patterson, Dr. McNeel, the defense expert, concluded that he was competent to stand trial and that he was sane when he committed the murders.

At the jury trial on competency in early May 1993, the State had the burden of proving competency because Patterson previously had been adjudged incompetent to stand trial. Against counsel's advice, Patterson testified, complaining about his court-appointed attorneys, implanted devices, the criminal justice system, and his treatment in jail. He refused to submit to cross-examination, invoking his Fifth Amendment privilege against self-incrimination. The trial court granted the State's motion to strike Patterson's testimony and instructed the competency jury to disregard it. The jury found Patterson competent to stand trial.

3

Voir dire for the trial on the merits commenced approximately six weeks later. Throughout voir dire and the guilt-innocence phase of trial, the trial court frequently had Patterson removed from the courtroom because of his disruptive outbursts. During voir dire, Patterson continually complained that his court-appointed counsel did not represent him. At one point, he stated that they specialized in being "set-up" lawyers and that he had heard them make a deal where they had a remote control device "put in" him. Against the advice of counsel, Patterson testified at the guilt-innocence phase. After answering questions about his name and address, Patterson began ranting about his lawyers and the police and complaining about implanted electronic remote control devices, frequently telling his lawyer to "be quiet." He referred to "these charges on me that was did with some electrical devices." When the prosecutor attempted to cross-examine him, he continued to talk about implanted devices that controlled his actions and again pleaded the Fifth Amendment. On July 1, 1993, the jury convicted him of capital murder, rejecting his insanity defense.

Patterson was present at the start of the punishment phase, but was removed from the courtroom because of his disruptive behavior and was not present for any of the testimony. The jury answered the future dangerousness special issue affirmatively and answered the mitigation special issue negatively. Patterson was sentenced to death.

4

Patterson filed an application for state habeas relief in May 1997. The state trial court conducted an evidentiary hearing on Patterson's incompetency to stand trial and ineffective assistance of counsel claims. In March 1998, the state habeas trial court entered findings of fact and conclusions of law, recommending that relief be denied. The Texas Court of Criminal Appeals denied relief in May 1998, based on the trial court's findings.

Patterson filed a federal habeas petition in August 1998. The district court stayed Patterson's execution, which had been scheduled for August 31, 1998, during the pendency of the federal habeas proceedings. After conducting evidentiary hearings in May and August 1999 on Patterson's claim that he is presently incompetent to be executed, the magistrate judge recommended that relief be denied. The district court adopted the magistrate judge's recommendation and denied federal habeas relief on January 30, 2001.

The district court granted a COA for Patterson's claims that (1) he was incompetent to stand trial; and (2) counsel rendered ineffective assistance at the guilt-innocence and punishment phases. Patterson seeks a COA from our court for his claims that: (1) he is presently incompetent to be executed; and (2) the trial court denied him due process by failing to conduct a mid-trial competency hearing. Patterson also argues that he received ineffective assistance of counsel at the competency trial. The district court's COA, however, is limited to Patterson's claims of

ineffective assistance of counsel at the guilt-innocence and punishment phases of trial. We therefore construe Patterson's argument that his counsel rendered ineffective assistance at the competency trial as a request for a COA. See Hill v. Johnson, 114 F.3d 78, 81 (5th Cir. 1997) (construing notice of appeal and request for certificate of probable cause as a request for COA); FED. R. APP. P. 22(b) ("If no express request for a [COA] is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals.").

## II

We address first the claims for which the district court granted a COA. We then turn to the claims for which Patterson requests a COA from our court.

## A

## Merits Issues

As we have said, the district court granted a COA for Patterson's claims that he was incompetent to stand trial and that he received ineffective assistance of counsel at the guilt and punishment phases of trial. Because Patterson filed his federal habeas petition after the effective date of the Anti-terrorism and Effective Death Penalty Act (AEDPA), he is not entitled to federal habeas relief on these claims unless the state court's adjudication of the claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

6

law, as determined by the Supreme Court of the
United States; or

> (2) resulted in a decision that was based
> on an unreasonable determination of the facts
> in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States ... if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision "involve[s] an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States ... if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A state court's findings of fact are presumed to be correct unless the petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

1

Competency to Stand Trial

We address first Patterson's claim that he was incompetent to stand trial. Patterson argues that the district court erred by limiting its review to the reasonableness of the determination of the jury at the competency hearing for two reasons: first, because

7

the issue was subsequently presented <u>de</u> <u>novo</u> in the state habeas court, with additional evidence relevant to the determination; and, second, it is unclear whether the state habeas court resolved the issue, because it drew no conclusion other than that "Petitioner is competent." Alternatively, assuming that the state habeas court's determination that he "is competent" was a conclusion that he was competent to stand trial in 1993, Patterson argues that the district court erred by treating competency as a question of fact. Patterson maintains that, although the threshold question whether the defendant suffers from a mental illness is a fact issue, the ultimate question of incompetency to stand trial is a mixed question of law and fact. He therefore argues that the district court should have determined whether the state court's conclusion that he "is competent" was an unreasonable application of the law to the facts. In the further alternative, Patterson argues that, if competency is an issue of fact, he presented clear and convincing evidence of his incompetency at the state habeas hearing. Therefore, any factual finding of the state habeas court that he was competent to stand trial in 1993 is an unreasonable determination of the facts.

It is well-settled that the criminal trial of an accused who is legally incompetent violates due process. <u>Bishop v. United States</u>, 350 U.S. 901 (1956); <u>Pate v. Robinson</u>, 383 U.S. 375, 378 (1966); <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 353 (1996). An accused is competent to stand trial if he "has sufficient present ability

8

to consult with his lawyer with a reasonable degree of rational understanding[;] and . . . has a rational as well as factual understanding of the proceedings." Dusky v. United States, 362 U.S. 402, 403 (1960).

Our precedent is conflicting as to whether competency to stand trial is a question of fact or a mixed question of law and fact. Compare Bouchillon v. Collins, 907 F.2d 589, 593 n.11 (5th Cir. 1990) (mixed question) and Washington v. Johnson, 90 F.3d 945, 951 (5th Cir. 1996) (same) with Profitt v. Waldron, 831 F.2d 1245, 1250 (5th Cir. 1987) (jury finding of competency to stand trial is factual finding entitled to presumption of correctness); Carter v. Johnson, 131 F.3d 452, 460 (5th Cir. 1997) (same); see also Miller-El v. Johnson, 261 F.3d 445, 454 (5th Cir. 2001) (applying AEDPA's "unreasonable application" standard to state court competency determination, but also stating that "[a] state court's competency determination is a finding of fact entitled to a presumption of correctness"), rev'd on other grounds, 123 S.Ct. 1029 (2003). The Supreme Court, however, has treated competency to stand trial as a question of fact. See Maggio v. Fulford, 462 U.S. 111, 117 (1983). We need not resolve this conflict in our caselaw. Based on our review of the evidence presented at the competency trial and the state habeas hearing, described below, we conclude that the state court's adjudication of this claim did not result in a decision that was contrary to, or involved an unreasonable application of,

9

clearly established federal law, and did not result in a decision that was based on an unreasonable determination of the facts.

Prior to the competency trial, the defense psychiatric expert, Dr. McNeel, examined Patterson and found him competent to stand trial. Dr. Cox, a psychologist who consulted with defense counsel, agreed with Dr. McNeel that Patterson was competent to stand trial. Neither doctor testified at the competency trial.

Patterson refused to cooperate in an evaluation by Dr. Quijano, the State's expert psychologist. Dr. Quijano testified at the competency trial that, based on his review of Patterson's records, Patterson suffered from paranoid schizophrenia, but he was competent to stand trial.

Several jailers had come into contact with Patterson during the seven months that he was in jail awaiting trial. They testified that Patterson was able to keep his cell clean, take care of his personal hygiene, and communicate his needs. One jailer testified that Patterson was able to follow jail rules and regulations and that he believed that Patterson could talk sensibly to his attorneys. The chief jailer testified that, although Patterson had indicated that he was unhappy with his attorneys, Patterson had the ability to communicate with his attorneys if he chose to do so. He further testified, however, that Patterson believed that his food was being drugged and that the jailers had come into his cell at night and injected something into his body.

10

The State's expert psychiatrist, Dr. Grigson, had found Patterson incompetent to stand trial in 1980. He acknowledged that he had not interviewed Patterson since 1981 but, based on his review of Patterson's records and observation of Patterson in the courtroom, he testified that Patterson was competent to stand trial. According to Dr. Grigson, Patterson had learned to manipulate the criminal justice system and was faking psychosis.

As we have noted earlier, Patterson testified at the competency trial, against the advice of his counsel. On direct examination, he complained about his attorneys, conditions in the jail, and a device that had been implanted in his body to control his behavior. He refused to submit to cross-examination by the State, asserting his Fifth Amendment privilege against self-incrimination. The trial court granted the State's motion to strike Patterson's testimony and instructed the competency jury to disregard it.

Although one of Patterson's attorneys had testified at a pretrial hearing that Patterson was not capable of consulting with counsel with a reasonable degree of rational understanding, neither of Patterson's attorneys testified at the competency trial.

At the state habeas evidentiary hearing, some of the testimony was slanted differently. Dr. Quijano admitted that when he found Patterson competent to stand trial, he had been operating under the faulty assumption that he should presume Patterson competent until it could be positively demonstrated that he was not, and that he

11

had not then found any such positive demonstration. Now, however, his review of the transcript of Patterson's outbursts during jury selection and trial raised sufficient doubt in his mind about the correctness of his earlier conclusion that, in hindsight, he would have recommended that the competency issue be revisited. Dr. Quijano conceded that Dr. McNeel, who had examined Patterson, would have been in a better position to make a competency determination.

Further, at the state habeas hearing, Patterson's expert, Dr. Childs, testified that Patterson was incompetent to stand trial and that he was not faking mental illness. Dr. Childs, however, was unable to examine Patterson because Patterson refused to cooperate. Dr. Childs's conclusion was based on his review of trial transcripts, medical records, and interviews. He deduced from this information the basis to describe a fixed delusional system in which Patterson believed that he was tried for capital murder because of a hell pledge placed on him by an unknown person; that the trial judge, prosecutors, and his counsel are all hell workers conspiring against him to effectuate the hell pledge; and that the only way to invalidate his conviction and sentence is to "put hell" on the conspirators by telling them, in a ritualistic way, to "go to hell." Dr. Childs testified that Patterson's delusional beliefs rendered him incapable of rationally understanding the proceedings against him or consulting with his attorneys.

Dr. McNeel, the only mental health expert who examined Patterson for competency to stand trial, testified at the state

12

habeas evidentiary hearing that Patterson was competent to stand trial. He acknowledged that, hypothetically, a person suffering the "hell pledge delusion" could be incompetent to stand trial; but he testified that, even if Patterson currently suffered such a delusion, he could not assume that Patterson suffered that delusion at the time of his trial in 1993. Dr. McNeel's evaluation of Patterson in 1993 revealed that, although Patterson suffered some delusions regarding implanted remote control devices, Patterson did not connect those devices with the judicial process, but discussed them only in the context of something that had happened in the past.

Considering all of the evidence, the state habeas trial court found that Patterson "is capable of communicating with his attorneys," that Patterson did not meet his burden of establishing that he cannot do so with a rational degree of understanding, and that Patterson "demonstrated during his trial ... the capability of refraining from disruptive behavior when he chose to." In its conclusions of law, it simply stated: "Petitioner is competent." The magistrate judge and the district court stated, however, that, if they were reviewing the issue de novo, they would have concluded that Patterson was incompetent to stand trial. Nevertheless, they held that Patterson had failed to rebut, with clear and convincing evidence, the state competency jury's factual determination that Patterson was competent.

13

Based on our review of the record of the competency trial and the state habeas hearing, we conclude that the competency jury and the state habeas court did not unreasonably determine that Patterson was competent to stand trial in 1993. Every psychiatric expert who had contact with Patterson immediately prior to his trial, including the two experts consulted by defense counsel, concluded at that time that he was competent to stand trial. Although Dr. Quijano's testimony at the state habeas hearing indicated retrospective doubts about Patterson's competency to stand trial, Dr. Quijano nevertheless testified that he believed Patterson was competent to stand trial in 1993. Dr. Childs never examined Patterson and did not observe Patterson's demeanor in the courtroom in 1993. His opinion was based on speculation -- speculation that Patterson suffered the hell pledges delusion in 1993. Dr. McNeel, the defense expert who examined Patterson in 1993, testified that Patterson gave no indication that he suffered such a hell pledges delusion at that time. Our review of the record supports that conclusion. Patterson's outbursts and testimony at the competency trial and the trial on the merits in 1993 do not contain any references to the hell pledges delusion that had become apparent by the time of the state habeas evidentiary hearing. Although Dr. McNeel did not testify at the competency hearing, his opinion, it is fair to say, is the most credible evidence on the question whether Patterson was competent to stand trial in 1993. We reach this conclusion in substantial

14

part because he was the only mental health expert who was able to examine Patterson.

In sum, we conclude that Patterson has not demonstrated that the state courts' adjudication of his claim that he was incompetent to stand trial resulted in a decision that was based on an unreasonable determination of the facts in the light of the evidence presented in the state court proceedings or a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. We thus affirm the district court's denial of habeas relief for this claim.

2

Ineffective Assistance of Counsel

Patterson argues that trial counsel rendered ineffective assistance at all stages of his criminal trial: at the competency hearing, at the guilt-innocence phase of his trial, and at the punishment phase of his trial. The district court granted a COA only with respect to the guilt-innocence phase and the punishment phase. Accordingly, we cannot consider the competency hearing claim unless we first grant a COA for that particular claim. See 28 U.S.C. § 2253(c)(1); Dowthitt v. Johnson, 230 F.3d 733, 739 (5th Cir. 2000) (under AEDPA, petitioner must first obtain a COA in order for appellate court to review district court's denial of habeas relief). We will address that claim later in this opinion, along with Patterson's other COA requests. We will now turn to consider the claims related to the guilt and punishment phases of

15

his trial on which the district court granted a COA. We begin by reviewing the applicable law.

To establish an ineffective assistance of counsel claim, Patterson must show that his counsel's performance was deficient and that he was actually prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984). Whether counsel's performance was deficient is determined by examining whether the challenged representation fell below an objective standard of reasonableness. Kitchens v. Johnson, 190 F.3d 698, 701 (5th Cir. 1999). We are mindful that our "scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Strickland makes clear that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690-91; see also United States v. Jones, 287 F.3d 325, 331 (5th Cir.) ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."), cert. denied, 123 S.Ct. 549 (2002); Lockett v. Anderson, 230 F.3d 695, 714 (5th Cir. 2000) (Strickland requires deference to counsel's "informed strategic choices"). "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional

16

assistance." Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Jones, 287 F.3d at 331. To overcome the deference given to informed strategic decisions, Patterson must show that his counsel "blundered through trial, attempted to put on an unsupported defense, abandoned a trial tactic, failed to pursue a reasonable alternative course, or surrendered his client." Id.; see also Moore v. Johnson, 194 F.3d 586, 615 (5th Cir. 1999) ("Strickland does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose.").

Even if Patterson establishes that his counsel's performance was deficient, he must also establish that "prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different." Ransom v. Johnson, 126 F.3d 716, 721 (5th Cir. 1997). Patterson must show that the prejudice rendered the outcome "fundamentally unfair or unreliable." Id. (quoting Lockhart v. Fretwell, 506 U.S. 364 (1993)).

Under AEDPA, we must give proper deference to the state court's determination that trial counsel did not render ineffective

17

assistance.  See Ladd v. Cockrell, 311 F.3d 349, 351 (5th Cir. 2002).  Because the state court properly identified Strickland as the governing legal principle, the "unreasonable application" prong of section 2254(d)(1) provides the standard which governs our review of the state court's decision regarding Patterson's ineffective counsel claims.  Bell v. Cone, 122 S.Ct. 1843, 1850 (2002).  In making the "unreasonable application" inquiry, we must determine whether the state court's application of Strickland was objectively unreasonable.  Id.; Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), cert. denied, 123 S.Ct. 963 (2003). Under section 2254(d)(1), "[w]e have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of Strickland is erroneous or incorrect."  Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002) (quoting Neal, 286 F.3d at 236).  "The federal-habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state court decision is objectively unreasonable."  Woodford v. Visciotti, 123 S.Ct. 357, 361 (2002).

a

### Failure to Fully Utilize Experts

Patterson argues that, at both phases of the trial, counsel failed to utilize fully the services of a defense expert. According to Patterson, such an expert was needed to assist with cross-examination of Dr. Grigson at the guilt-innocence phase

18

regarding his testimony that Patterson was faking psychosis at the time of the offense; to monitor Patterson's mental state and to alert counsel and the court if Patterson became incompetent during the proceedings; to persuade the trial court to revisit the issue of Patterson's competence to stand trial; to facilitate presentation of evidence at the punishment phase; and to urge the jury to regard Patterson's diminished mental capacity as a mitigating circumstance.

The state habeas trial court found that trial counsel were furnished adequate financial resources to consult experts regarding Patterson's mental competency; that the experts consulted by trial counsel were qualified in their field; and that Dr. Cox, one of the experts consulted by Patterson's trial counsel, was available and assisted during the trial. It concluded that Patterson had not demonstrated that counsel made mistakes or omissions that fell below an objective standard of reasonableness and that Patterson was not denied the effective assistance of counsel.

Considering the respective arguments presented, we conclude that Patterson has not rebutted the state habeas trial court's factual finding that Dr. Cox was available and assisted his counsel during trial. In the light of that finding, the state court's conclusion that trial counsel did not render ineffective assistance by failing to fully utilize the services of a defense expert is neither contrary to, nor an unreasonable application of, federal

19

law.  Accordingly, we affirm the district court's denial of habeas relief for this claim.

b

Guilt-Innocence Phase

Patterson argues that counsel rendered ineffective assistance at the guilt-innocence phase of trial by failing to offer his medical records in support of the insanity defense and by failing to object to the prosecutor's closing argument.  We address each of these claims separately.

(1)

Failure to Present Evidence in Support of Insanity Defense

Patterson relied on an insanity defense at the guilt-innocence phase of trial.  Patterson's counsel presented the testimony of Patterson's brother and roommate regarding Patterson's history of mental illness, prior hospitalizations, and bizarre behavior immediately prior to the murders.  They also presented expert testimony that Patterson suffered from paranoid schizophrenia, a mental illness which can render a person unable to distinguish between right and wrong.  But Patterson says that counsel should have done more:  They should have offered his medical records in support of the insanity defense.  Those records showed a history of violent acts, followed by determinations of incompetency to stand trial, hospitalization and restored competency following the administration of medication, and determinations that he was insane at the time the offenses were committed.

20

At the state habeas evidentiary hearing, both of Patterson's trial counsel testified that there was a strategic reason for not introducing the medical records:  Those records would have revealed to the jury that Patterson had escaped conviction for two prior shootings.  Counsel feared that the jury's indignation at Patterson's previous, unpunished violent acts would overwhelm the jury's ability to consider the evidence of insanity objectively. The state habeas court found that the strategic reasons proffered by trial counsel were valid.

The district court acknowledged that Patterson's medical records would have been "highly relevant" on the issue of Patterson's sanity at the time of the murders.  It concluded, however, that trial counsel's decision to try to meet their burden through testimony about Patterson's generally bizarre behavior, without introducing prejudicial evidence of Patterson's prior criminal conduct or hospitalizations, did not fall outside the wide range of constitutionally acceptable assistance.

Patterson contends that the medical records would have supported his insanity defense.  He argues that trial counsel's proffered strategic reason for not introducing the records is evidence of ineffective assistance of counsel, because an attorney should not assume that a jury will ignore the law because it is prejudiced by the facts.

We conclude that the state court's decision that counsel did not render ineffective assistance at the guilt-innocence phase by

failing to present Patterson's medical records is neither contrary to, nor an unreasonable application of, federal law. Trial counsel had valid strategic reasons for not presenting the medical records -- counsel did not want to portray Patterson to the jury as a dangerous person who had twice escaped conviction for violent assaults. We therefore affirm the district court's denial of habeas relief for this claim.

(2)

### Failure to Object to Prosecutor's Closing Argument

Patterson argues that trial counsel also rendered ineffective assistance at the guilt-innocence phase by failing to object to the prosecutor's closing argument. Patterson characterizes the prosecutor's argument as an invitation to the jury to nullify the law of insanity, to set its own standard, and to hold Patterson accountable for refusing to take his medication. The state habeas court found that Patterson failed to meet his burden of showing that trial counsel made omissions which fell below an objective standard of reasonableness.

The district court construed the prosecutor's argument as urging the jury not to believe Patterson's claim that he did not know right from wrong because he did not take his medication. The district court stated that, in any event, it was unclear whether voluntarily failing to take anti-psychotic medication provides a valid legal ground for a jury's rejecting an insanity defense. It therefore held that, considering the unsettled state of the law and

22

the context in which the remarks were made, the prosecutor's argument was not improper and counsel did not render deficient performance by failing to object.

The state court's decision that counsel did not render ineffective assistance by failing to object to the prosecutor's closing argument is neither contrary to, nor an unreasonable application of, federal law. Even assuming that the failure to object constitutes deficient performance, Patterson has not demonstrated prejudice -- he has not shown that there is a reasonable probability that the trial court would have sustained such an objection had it been made or that, had it been sustained, that there is a reasonable probability that the jury would have found him not guilty by reason of insanity. We therefore affirm the district court's denial of habeas relief for this claim.

c

Punishment Phase

Patterson argues that counsel rendered ineffective assistance at the punishment phase by failing to introduce his medical records, bolstered by expert testimony. This evidence, he argues, would have supported the argument that he would not constitute a future danger to society if institutionalized and forcibly medicated. Such evidence also would have supported the argument for diminished capacity as a mitigating circumstance. In order to give some context to our consideration of this claim, we will first describe the evidence presented at the punishment phase.

23

The State presented the testimony of the victims Patterson shot in 1980 and 1983. Both of them testified that they did nothing to provoke the attacks. Both of them were aware that Patterson was not convicted for the shootings, and one of them testified that he was aware that Patterson had been found mentally incompetent. Three law enforcement officers testified that Patterson's reputation in the community for being peaceful and law-abiding was bad.

Patterson's counsel presented the testimony of Patterson's brother and sister regarding Patterson's history of mental illness. Both testified that they believed Patterson would benefit from psychiatric care because he had benefitted from such care in the past. Patterson's brother, a correctional officer for the Texas Department of Criminal Justice ("TDCJ"), also testified that TDCJ had programs and facilities for mentally ill inmates with staff psychiatrists and psychologists who could administer medication and treatment.

The jury was instructed that a prisoner serving a life sentence for a capital felony is not eligible for parole until the prisoner has served 35 years. In closing argument, Patterson's counsel observed that, if Patterson were sentenced to life imprisonment, he would be 74 years old before he could even be considered for parole. Counsel continued: "We're talking about him going to die or spend basically the rest of his life in the penitentiary where he can be forced to take medication, where he

24

can be watched 24 hours a day, where he will be behind bars for the rest of his life." Patterson argues that his medical records establish that he is not violent when forcibly medicated in an institutionalized setting, and that expert testimony was available to show that the Texas prison system has procedures for forcibly medicating dangerous, mentally ill inmates. Although the medical records show some additional instances of violent behavior by Patterson while institutionalized, Patterson argues that, because those incidents occurred relatively early in the hospitalizations, the medical records would have supported an argument by counsel that he is not violent once he is placed on anti-psychotic medication and that medication has had time to take effect.

With respect to diminished capacity, Patterson argues that the medical records show that, even after his medication took effect and he was no longer violent, he never gained any insight into the need to continue taking the medication in order to avoid future psychosis. He thus contends that, had his trial counsel admitted the records, they could have argued convincingly that his conduct was a result of his diminished capacity because of his illness. Furthermore, Dr. Quijano would have been willing to testify that Patterson would have had substantial difficulty conforming his conduct to the law because of his paranoid schizophrenia. Patterson argues that such evidence of diminished capacity would have provided a basis for the jury to assess a sentence less than death.

25

The State counters that counsel had valid strategic reasons for not presenting the medical records, because they contained accounts of additional instances of violent conduct by Patterson during his prior hospitalizations. According to the State, these additional instances of violent conduct could seriously have undermined counsel's argument that the State had failed to prove that Patterson would present a future danger to society if incarcerated.

We begin our analysis of these particular claims of ineffective counsel by observing that Patterson's trial counsel were faced with a formidable task in defending Patterson: He did not want them to represent him; the evidence of his guilt was overwhelming; he refused to heed their advice; and he refused to cooperate with mental health experts who tried to evaluate him.

The testimony of Patterson's trial counsel at the state habeas evidentiary hearing reflects that they made an informed strategic decision to forego the use of Patterson's medical records and expert testimony in support of an argument that Patterson's diminished capacity was a mitigating circumstance. Patterson's counsel testified that they explored the possibility of presenting the testimony of Dr. McNeel or Dr. Cox at the punishment phase of trial, but decided that it would be more harmful than beneficial. According to counsel, Dr. McNeel believed that Patterson was just mean-spirited and that his behavior was not attributable to his mental illness. It is true that Dr. Cox believed there was some

26

level of impairment due to Patterson's mental illness; but counsel believed that Dr. Cox's less than fully supportive testimony would have minimized the impact of the stronger evidence of Patterson's mental illness presented through family members and acquaintances. Counsel testified that they were concerned that introduction of the medical records for mitigation would inform the jury of the ineffectiveness of Patterson's treatment after the prior shooting episodes and would present to the jury a harmful pattern of Patterson's committing violent acts, being hospitalized, and then committing other violent acts after he was released.

Furthermore, with respect to the future dangerousness issue, counsel's decision not to use the penitentiary medical records, and evidence regarding forcible medication procedures at the penitentiary, was also an informed strategic decision requiring deference under Strickland. The testimony of both of Patterson's defense lawyers at the state habeas evidentiary hearing indicates that they were familiar with the contents of Patterson's medical records and, based upon their review of the medical records, they consciously decided not to use the medical records during the punishment phase. Counsel testified that the defense theory at the punishment phase was to portray Patterson as a mentally ill person who did not need to be put to death, but should instead be put in prison where he could get some help. Counsel acknowledged that they were aware that Patterson's medical records showed that his condition improved when he was on medication. Counsel believed,

27

however, that the medical records contained some damaging information that would have emphasized that treatment had been ineffective for Patterson in the past. Counsel testified further that they were aware that Patterson could be forcibly medicated in prison, and that they could have called Dr. Quijano or other people from the penitentiary to testify on that issue. When asked, however, whether they attempted to convince the jury that Patterson would not be dangerous to others in the penitentiary if confined on a life sentence, one of Patterson's lawyers responded that he was not sure how he could have done that. Counsel acknowledged that he did not present any direct evidence that Patterson's violent and aggressive behavior could be controlled through the administration of antipsychotic medication, or that such medication could be administered forcibly if Patterson were serving a life sentence in the penitentiary. Nevertheless, counsel presented the testimony of Patterson's brother, a state correctional officer, that within the prison system there are programs for mentally ill inmates with psychiatrists and psychologists available. Furthermore, Patterson's brother and sister both testified that his condition improved when he was on medication.

Counsel explained that they feared that the introduction of Patterson's medical records would have opened the door for the prosecutor to argue that the treatment Patterson had received in the past had not prevented subsequent acts of violence and thus would have lessened their ability successfully to argue for

28

institutionalization rather than the death penalty. Counsel testified that they decided instead to rely on the State's failure to present evidence that Patterson did not do well in an institutionalized environment.

As we have earlier noted, counsel's decision not to introduce Patterson's medical records at the guilt-innocence phase was a reasonable strategic decision, because those records would have informed the jury of Patterson's prior violent assaults that were the basis for two of his previous hospitalizations. Patterson argues that the same does not hold true for the punishment phase, because, by the time the defense presented its case at the punishment phase, the State had already presented the testimony of the victims of those prior assaults. Both of the victims testified that Patterson was not convicted for shooting them, and one of them testified that he was aware that Patterson had been found mentally incompetent. Patterson thus contends that, because the jury already was aware that he had escaped punishment for the two prior shootings, the jury reasonably could have inferred that any prior treatment he had received for his mental illness had not prevented the murders for which they were to assess punishment.

Applying AEDPA's deferential standard, we conclude that the state court did not apply Strickland unreasonably when it found that trial counsel justifiably believed that introduction of the medical records at the punishment phase would have negated the effectiveness of their argument that confinement rather than the

29

death penalty could have served the public interest in avoiding further violence by Patterson.  A trial counsel's reasoned decision not to introduce evidence, containing both helpful and damaging information, cannot be deficient performance.  Duff-Smith v. Collins, 973 F.2d 1175, 1183 (5th Cir. 1992); see also Johnson v. Cockrell, 306 F.3d 249, 253 (5th Cir. 2002) (failure to introduce double-edged evidence, so long as part of an informed trial strategy, cannot constitute deficient performance); Foster v. Johnson, 293 F.3d 766, 778-79 (5th Cir.), cert. denied, 123 S.Ct. 625 (2002).  We therefore affirm the district court's denial of habeas relief on Patterson's claim that he received ineffective assistance of counsel at the punishment phase.

B

## COA Issues

Patterson seeks a COA on three claims:  first, that the state trial court denied him due process by failing to conduct a mid-trial competency hearing; second, that he is presently incompetent to be executed; and finally, because the district court's grant of COA on the ineffective assistance of counsel claims was limited to the guilt-innocence and punishment phases of trial, we construe his argument that he received ineffective assistance of counsel at the competency trial as a request for a COA.

"[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."  Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).

30

To obtain a COA, Patterson must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Miller-El, 123 S.Ct. at 1039; Slack v. McDaniel, 529 U.S. 473, 483 (2000). To make such a showing, he must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1039 (quoting Slack, 529 U.S. at 484). Because the district court denied relief on the merits of the claims for which Patterson seeks a COA, he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.

In Miller-El, the Supreme Court instructed, as it had previously held in Slack, that we should "limit [our] examination to a threshold inquiry into the underlying merit of [the petitioner's] claims." Miller-El, 123 S.Ct. at 1034. The Court observed that "a COA ruling is not the occasion for a ruling on the merit of petitioner's claim...." Id. at 1036. Instead, our determination must be based on "an overview of the claims in the habeas petition and a general assessment of their merits." Id. at 1039. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Id. We do not have jurisdiction to justify our denial of a COA based on an adjudication of the actual merits of the claims. Id.

31

Accordingly, we cannot deny an "application for a COA merely because [we believe] the applicant will not demonstrate an entitlement to relief." Id. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id.

Thus, we reiterate that our task is to determine whether Patterson has demonstrated "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.

1

## Ineffective Assistance of Counsel at Competency Hearing

Patterson requests a COA for his claim that at the competency hearing counsel rendered deficient performance by: first, failing adequately to prepare the defense expert, Dr. McNeel; second, failing personally to testify as to Patterson's incompetency; third, failing to present evidence of his prior hospitalizations; fourth, failing to present the testimony of an attorney who had previously represented him; and, finally, failing to discover that Dr. Quijano's competency determination was based on his erroneous assumption that Patterson bore the burden of proving his incompetency.

a

## Inadequate Preparation of Expert

32

Patterson argues that counsel did not adequately prepare Dr. McNeel to give a fully informed opinion on his competency to stand trial, because they: (1) failed to provide Dr. McNeel with Patterson's Terrell Hospital records, in which it was first documented that Patterson's denials of auditory hallucinations were false; (2) did not supply to Dr. McNeel any information from Patterson's family and friends regarding his past patterns of psychosis, his hallucinatory behavior in the days before the murders, and the fact that Patterson was hallucinatory while awaiting trial; and (3) did not educate Dr. McNeel about the extent and nature of Patterson's fixed delusional system. To support these claims, Patterson relies on Dr. McNeel's testimony at the state habeas evidentiary hearing. In response to a hypothetical question, Dr. McNeel testified that, if Patterson's delusional system included a belief that the judge, lawyers, and jury were all part of the hell pledges against him, he would have had to question Patterson's ability to assist his counsel and thus would have felt Patterson was most likely not competent to stand trial. Patterson argues that this response at the habeas hearing shows that, had Dr. McNeel been properly prepared at the competency hearing, he likely would have concluded that Patterson was incompetent to stand trial.

Patterson has not made a substantial showing of the denial of a constitutional right and thus is not entitled to a COA for this claim. Even assuming that reasonable jurists would find it debatable whether counsel inadequately prepared Dr. McNeel, they

33

would not find it debatable whether Patterson was prejudiced. Dr. McNeel testified at the state habeas hearing that nothing that had been revealed during the state habeas proceedings undermined his determination that Patterson was competent to stand trial in 1993. Patterson's reliance on Dr. McNeel's response to the hypothetical question is unavailing, because there is no evidence -- only speculation -- that, at the time of his trial in 1993, Patterson suffered from the hell pledges delusion, or that he had incorporated the jury, judge, and his lawyers into his delusional system.

b

Failure to Present Evidence

Patterson next argues that counsel performed deficiently by: failing personally to testify at the competency hearing as to their difficulties in communicating with him; failing to present to the competency jury his medical records showing a long history of incompetence; failing to present the testimony of a lawyer who had represented him previously; and failing to interview Dr. Quijano to learn that his conclusion that Patterson was competent was based on the faulty legal assumption that Patterson was competent to stand trial until an examination could prove otherwise. He contends further that counsel's decision not to introduce the medical records was not an informed decision, because counsel had not talked to Patterson's family and were thus unaware that Patterson was hallucinating while in jail awaiting trial. Patterson argues

34

that the medical records, which show a pattern of incompetency and a restoration of competency only after forcible medication, could have been used to argue that, in the light of Patterson's not taking medication prior to trial, his refusal to cooperate with his attorneys was the product of his mental illness rather than obstinacy or malingering.

Patterson has not made the showing required for a COA on this claim. Jurists of reason would not find it debatable whether counsel's performance was deficient, or whether Patterson was prejudiced. The district court concluded that testimony from Patterson's trial counsel at the competency hearing would have had only marginal value because counsel could not say for certain whether they thought Patterson was incompetent or simply obstinate. Trial counsel testified that they did not introduce Patterson's medical records at the competency hearing because they feared the jury would have been too frightened by Patterson's prior history of delusional violence to focus on the issue of his mental capacity; and they abandoned the idea of calling Patterson's former attorney, Henderson, as a witness because he had described Patterson as "one mean S.O.B." and because it could have opened the door to evidence regarding the underlying violent crime leading to Henderson's representation of Patterson. Counsel's failure to interview Dr. Quijano is not surprising inasmuch as Dr. Quijano was an expert witness for the State. In any event, Dr. Quijano testified at trial and at the state habeas evidentiary hearing that he believed

35

Patterson was competent to stand trial. We also note that counsel elicited information about Patterson's psychiatric history during cross-examination of the State's experts, including the fact that Patterson had been found incompetent to stand trial on two previous occasions.

In sum, the district court's assessment of Patterson's claim that he received ineffective assistance of counsel at the competency trial is neither debatable nor wrong. We therefore deny a COA for this claim.

2

### Failure to Conduct Mid-Trial Competency Hearing

Patterson also seeks a COA for his claim that the state trial court denied him due process by failing to halt the trial long enough to revisit the issue of his competency to stand trial.

A trial judge must conduct an inquiry into a criminal defendant's competency to stand trial whenever the trial judge receives information which, objectively considered, "should have raised a doubt about the defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir. 1980). "If the trial court receives evidence, viewed objectively, that should raise a reasonable doubt as to competency, yet fails to make further inquiry, this constitutes a denial of a

36

fair trial."  Carter v. Johnson, 131 F.3d 452, 459 n.10 (5th Cir. 1997).

The state trial court conducted a jury trial on the issue of Patterson's competency to stand trial on May 3 and 4, 1993, less than two months prior to his capital murder trial.  In order to show that the trial court abused its discretion in failing to conduct a second, mid-trial competency hearing, Patterson must identify facts known to the trial court at that time that would have suggested that Patterson's mental status had deteriorated to the point that the jury's prior finding of competency was no longer valid.  See Drope v. Missouri, 420 U.S. 162, 181 (1975) ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."); Reynolds v. Norris, 86 F.3d 796, 801 (8th Cir. 1996) ("habeas petitioner has the burden to prove that objective facts known to the trial court raised a sufficient doubt to require a [mid-trial] competency hearing").

Patterson relies on the fact that he made frequent outbursts during the course of the trial that resulted in his removal from the courtroom.  He also points out that the state trial court was aware of additional evidence of his incompetency that was not available to the competency jury:  his testimony at the competency trial, which the competency jury was instructed to disregard, and his refusal to accept the State's offer of a life sentence in

37

exchange for a plea of guilty. Patterson argues that his inability to refrain from verbal outbursts during voir dire, his delusional insistence that his court-appointed counsel did not represent him, and his refusal to plead guilty should have alerted the trial court to the substantial possibility that Patterson was not competent to stand trial.

The state habeas trial court found that Patterson's behavior during the trial was not different from his behavior at the competency hearing less than two months earlier. The record supports that finding. The district court held that the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. We conclude that the district court's assessment of this claim is neither debatable nor wrong. Because Patterson's behavior at trial was consistent with his behavior at the competency hearing conducted less than two months earlier, reasonable jurists would not find it debatable whether Patterson's condition had deteriorated to the point that a renewed inquiry into competency was required. We therefore deny a COA for this claim.

3

<u>Incompetency to be Executed</u>

Finally, Patterson requests a COA for his claim that he is presently incompetent to be executed. The Supreme Court has held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." <u>Ford v.</u>

_Wainwright_, 477 U.S. 399, 409-10 (1986).  To be competent to be executed, a death row inmate must "know the fact of [his] impending execution and the reason for it."  _Id_. at 422 (Powell, J., concurring).  "If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied, and only if the defendant is aware that his death is approaching can he prepare himself for his passing."  _Id_.

When Patterson filed his state habeas application in May 1997, that was the only mechanism available under Texas law to raise the issue of his competency to be executed.  Accordingly, although an execution date had not been set at that time, Patterson raised the issue in his state habeas application.  At the state habeas hearing, Patterson acknowledged that he had been convicted of killing Louis Oates and Dorothy Harris and that the State intends to execute him by lethal injection for that offense.  The state habeas trial court found that Patterson's mental illness "does not prevent [him] from knowing and realizing that he is under a death sentence for actions he took in taking the lives of his victims," and concluded that "Petitioner is competent."

Patterson's federal habeas petition also claimed that he was presently incompetent to be executed.  At the time Patterson filed his federal habeas petition, an execution date had been set, but the district court entered a stay of execution for the duration of the federal habeas proceedings.  The magistrate judge appointed a psychiatric expert, Dr. Gripon, to evaluate Patterson, and

39

authorized funds for Patterson's counsel to retain an expert, Dr. Rogers. Patterson refused to submit to an evaluation by either expert. Both experts testified at the May 1999 federal evidentiary hearing that they could not determine definitively Patterson's present competency to be executed, but that there was no indication that Patterson's mental condition had changed since the state habeas evidentiary hearing. Both experts agreed that Patterson's refusal to cooperate in an evaluation was itself a product of his mental illness.

The magistrate judge continued the hearing until August so that Patterson could be transferred to a prison psychiatric facility. Following his transfer, Patterson continued to refuse to cooperate with the experts. When they attempted to interview him, he told them that he had received a permanent stay of execution, which they were endangering by attempting to interview him.

At the August 1999 federal evidentiary hearing, Patterson stated that he had received a permanent stay of execution. His counsel presented other evidence of his belief that he had received such a stay, including a letter in which Patterson stated that he had received a "full pardon." Dr. Rogers testified that, given Patterson's elaborate delusional system, it is "certainly possible" that he believes he is going to be executed because of the implants, hell pledges and conspiracies against him, and not because he committed the murders. Without being able to conduct a full evaluation, neither expert could say what Patterson meant by

40

his reference to a "permanent" stay of execution, or whether it was a manifestation of his delusional system.

The district court rejected Patterson's argument that his delusional understanding of how he came to be on death row prevents him from making the connection between his conduct and his punishment. The court concluded that Patterson's belief that he has received a pardon or a "permanent" stay of execution is merely a mistake of fact about the duration of the stay granted by the district court and is insufficient to defeat the presumption that Patterson is competent to be executed. The district court rejected Patterson's claim that, because his mental illness prevented the experts from evaluating his current competency, he cannot be executed so long as there are additional means available to ascertain his competency. The district court feared that delaying execution for indefinite, long-term observation in cases where a petitioner refuses to cooperate with a competency examination would invite death row inmates to engage in such tactics in order to delay or prevent their execution.

Patterson argues that he is incompetent to be executed because he cannot make a rational connection between his crime and his execution and, therefore, the retributive goal of criminal law will not be satisfied by executing him. He asserts that his belief that he has been pardoned for innocence demonstrates that he lacks a factual understanding that he is to be executed, and that his belief cannot possibly be explained as a misapprehension of the

41

source and duration of the district court's stay of execution. Patterson contends that the district court erred by denying his motion to require the State, as a condition of executing him, first to transfer him to a state mental health facility for a period of observation. He also asserts that the district court ignored the fact that neither of the experts who tried to examine him believed that he was malingering, as well as the fact that both of the experts testified that his refusal to cooperate in an evaluation was itself a product of his mental illness. Patterson concludes that, under these circumstances, where there is a viable chance that he is incompetent to be executed, but the same delusional system that makes him incompetent also prevents his habeas counsel from proving it, it is intolerable under the Eighth Amendment to allow the State to execute him.

On the other hand, the State counters that Patterson has failed to rebut, by clear and convincing evidence, the presumptively correct finding of the state courts that he is competent to be executed. The State asserts that there is no evidence that Patterson's mental status has changed, much less deteriorated to the point that the state courts' assessment of his competency in 1998 is no longer valid. To the extent that new evidence has surfaced regarding Patterson's understanding of whether he is going to be executed, the State asserts that a mechanism in Texas law exists for the consideration of such evidence in the context of an impending execution, TEX. CODE CRIM.

42

PROC. ANN. art. 46.05 (effective September 1, 1999), and the federal courts should defer to that process, allowing the state courts to consider that new evidence after an execution date has been scheduled. Finally, the State contends that, even assuming that Patterson's refusal to submit to an evaluation is a product of his mental illness and that a definitive conclusion on his current competency cannot be reached without such an evaluation, a federal habeas court does not have the power to order that Patterson be transferred to a non-correctional mental health facility.

Based on the evidence presented at the federal habeas evidentiary hearings, we conclude that reasonable jurists would find debatable Patterson's competency to be executed. Accordingly, we grant his request for a COA for this claim.

At the time of the state habeas evidentiary hearing, Patterson was competent to be executed: He knew that he was going to be executed and the reason for it. See Barnard v. Collins, 13 F.3d 871, 876-77 (5th Cir. 1994) (petitioner was competent to be executed even though his perception of the reason for his conviction and pending execution was distorted by a delusional system in which he attributed anything negative that happened to him to a conspiracy of Asians, Jews, Blacks, homosexuals, and the Mafia); Garrett v. Collins, 951 F.2d 57, 59 (5th Cir. 1992) (petitioner who believed dead aunt would protect him from poisons and toxins in lethal injection was competent to be executed).

43

By the time of the federal habeas evidentiary hearing, Patterson's delusions had evolved to the point that he apparently believed that he had received a "permanent" stay of execution and a "pardon for innocence." His letters indicate that he had, by that time, incorporated the district judge and his federal habeas counsel into his delusional system, believing them to be "hell workers." Because of Patterson's refusal to cooperate in an evaluation, which refusal both experts testified was a product of his mental illness, neither expert could say what Patterson meant by a "permanent" stay of execution. Patterson's statement that he had been "pardoned for innocence" raises serious questions about his understanding, at that time, of the fact that he is going to be executed.

The state courts have not had an opportunity to consider the evidence of Patterson's competency that was presented at the federal habeas evidentiary hearings in 1999. Moreover, it has been more than three years since those hearings were conducted. Patterson's execution was stayed by the district court, and no new execution date has been set. Under these circumstances, the state courts should be given the opportunity to evaluate Patterson's competency to be executed, in the light of the evidence presented at the federal evidentiary hearings, as well as any evidence of his condition in the intervening three years, when his execution is imminent. We therefore dismiss this claim, without prejudice. See Stewart v. Martinez-Villareal, 523 U.S. 637, 644-45 (1998) (Ford

44

claim raised for second time in subsequent federal habeas petition, when it is ripe because the execution is imminent, is not "second or successive" within the meaning of 28 U.S.C. § 2244 when claim raised in first federal habeas petition was dismissed without prejudice as unripe); Swann v. Taylor, 173 F.3d 425, 1999 WL 92435, at *17 (4th Cir. 1999) (dismissing without prejudice competency to be executed claim raised in first federal habeas petition because execution was not imminent).

## III

For the foregoing reasons, we AFFIRM the denial of habeas relief on Patterson's claims that he was incompetent to stand trial and that he received ineffective assistance of counsel at the guilt-innocence and punishment phases of trial; DENY a COA for Patterson's claims that counsel rendered ineffective assistance of counsel at the competency trial and for his claim that he was denied due process when the trial court failed to conduct a mid-trial competency hearing; and GRANT a COA for Patterson's claim that he is presently incompetent to be executed, but DISMISS that claim, without prejudice.

AFFIRMED in part, and DISMISSED, in part; COA DENIED in part, and GRANTED in part.

45