# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-70019

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2017

Lyle W. Cayce
Clerk

CARLOS TREVINO,

Petitioner–Appellant,

versus

LORIE DAVIS, Director,
  Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent–Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, DENNIS, and CLEMENT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Carlos Trevino appeals the denial of habeas corpus relief on his claim of ineffective assistance of trial counsel ("IATC"). Because Trevino has not demonstrated that trial counsel's performance in the punishment phase prejudiced him, we affirm.

I.

Trevino was convicted of capital murder for killing Linda Salinas. Further discussion of the factual background can be found in *Trevino v. Thaler*, 678 F. Supp. 2d 445, 449–50 (W.D. Tex. 2009), and *Trevino v. Davis*, 829 F.3d

No. 15-70019

328, 332–33 (5th Cir. 2016).  We recite only the facts needed to resolve the merits of the IATC claim regarding the mitigating evidence of fetal alcohol spectrum disorder ("FASD"), the claim on which we granted a certificate of appealability ("COA").

A.

Before the punishment phase, Trevino's counsel investigated the question of mitigation.

> [T]rial counsel attempted to find family members "that could give us some idea as to where or how Mr. Trevino grew up.  What was going on in his life.  What were the circumstances, you know, regarding his past.  And we tried to find them, but really, I don't think we came up with any witnesses.  We tried to contact his mother as best we could. She was from out of the city."  Trial counsel retained an investigator to track down [Trevino's] education records. . . . Trial counsel interviewed [Trevino's] stepfather. [Trevino] failed to assist his trial counsel in identifying any family members or others who may have provided mitigating testimony.

*Trevino v. Stephens*, No. SA–01–CA–306–XR, 2015 WL 3651534, at \*11 (W.D. Tex. June 11, 2015).  Trevino's mother was the main connection to the evidence of FASD.  Trevino's trial counsel testified at the state habeas hearing that Trevino's "mother was aware of [his] trial but she refused to communicate with [his] defense counsel."  *Id.* at \*11 n.35.  That was not contested until 2003, when trial counsel stated in an affidavit that "I did know his mother was around but we never could connect.  I believe she lived somewhere near Bastrop, Texas.  I heard she was in the court house [*sic*] one time but I never did talk with her."

Trial counsel ultimately put on a short presentation regarding mitigation.  The district court's original opinion summarized the evidence presented in the punishment phase as follows:

The prosecution presented evidence establishing (1) [Trevino] was first

2

referred to the Bexar County juvenile probation office at age thirteen, (2) as a juvenile, [Trevino] was adjudicated on charges of evading arrest, possession of up to two ounces of marijuana, unauthorized use of a motor vehicle, and unlawfully carrying a weapon (identified as a nine millimeter handgun), and (3) [Trevino] was convicted as an adult of operating a motor vehicle while intoxicated, burglary of a vehicle, and burglary of a building. The jury also heard uncontradicted testimony establishing (1) [Trevino] had identified himself to a juvenile probation officer as a member of a street gang and (2) [Trevino] was a documented prison gang member whose body bore the tell-tale tattoos indicative of [his] membership in the violent prison gang La Hermidad y Pistoleros Latinos ("HPL").

The defense presented a single witness, Trevino's aunt, who testified (1) she had known [Trevino] all his life, (2) [his] father was largely absent throughout [his] life, (3) [his] mother "has alcohol problems right now," (4) [his] family was on welfare during his childhood, (5) [Trevino] was a loner in school, (6) [Trevino] dropped out of school and went to work for his mother's boyfriend doing roofing work, (7) [Trevino] is the father of one child and is good with children, often taking care of her two daughters, and (8) she knows [he] is incapable of committing capital murder.

On July 3, 1997, after deliberating approximately eight hours, [Trevino's] jury returned its verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt, there is a probability [Trevino] would commit criminal acts of violence which would constitute a continuing threat to society, (2) beyond a reasonable doubt [Trevino] actually caused the death of Linda Salinas or, if [he] did not actually cause her death, [he] intended to kill her or another, or [he] anticipated a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, [Trevino's] character and background, and [his] personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment be imposed upon [Trevino]. In accordance with the jury's verdict, the state trial court imposed a sentence of death.

*Trevino*, 678 F. Supp. 2d at 452–53.

Trevino's initial collateral-review proceedings began with new appointed counsel while the direct appeal was ongoing. His initial state habeas counsel brought IATC claims with respect to the penalty phase but did not include a

claim that trial counsel had failed adequately to investigate and present miti-gating circumstances. Trevino alleges in his second amended petition that his state habeas counsel's petition included only "record-based claims" and that he conducted no independent mitigation investigation to uncover new evidence that might have lead him to conclude that he should bring an IATC claim on mitigation grounds.

## B.

After Trevino's state habeas petition had been denied by the Texas Court of Criminal Appeals, he filed a federal habeas petition, raising for the first time his claim that trial counsel had been ineffective in investigating and presenting mitigating evidence at the punishment phase.

> The federal court stayed proceedings to permit Trevino to raise this claim in state court. The state court held that because Trevino had not raised this claim during his initial postconviction proceedings, he had procedurally defaulted the claim, and the Federal District Court then denied Trevino's [IATC] claim. The District Court concluded in relevant part that, despite the fact that "even the most minimal inves-tigation . . . would have revealed a wealth of additional mitigating evi-dence," an independent and adequate state ground (namely Trevino's failure to raise the issue during his state postconviction proceeding) barred the federal habeas court from considering the [IATC] claim.

*Trevino v. Thaler*, 133 S. Ct. 1911, 1916 (2013). We affirmed on the same ground. The Supreme Court reversed, extending its holding in *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), that ineffective assistance of state habeas counsel would excuse procedural default of IATC claims, to Texas, where "it [is] highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of [IATC] on direct appeal . . . ." *Trevino*, 133 S. Ct. at 1921.

We remanded to the district court, where Trevino filed his second amended habeas petition. That court denied all habeas relief under that petition and refused to grant a COA, so Trevino sought a COA from this court.

No. 15-70019

[W]e grant[ed] [it] on the questions of whether the district court erred by: (1) concluding that Trevino failed to sufficiently plead cause to excuse his procedural default under *Martinez/Trevino*; (2) concluding that Trevino's trial counsel's performance was not deficient under *Strickland* with respect to his failure to discover and introduce FASD evidence; and (3) concluding that Trevino's trial counsel's performance did not prejudice Trevino to the extent his counsel failed to investigate and present evidence, both expert and lay, showing that Trevino suffers from FASD.

*Trevino*, 829 F.3d at 356. We now review the merits of those claims.[1]

## II.

Trevino's IATC claim was procedurally defaulted because he did not raise it in his initial state habeas petition. The procedural default may now be excused if he can demonstrate that his state habeas counsel was ineffective and the underlying IATC claim is substantial. *Trevino*, 133 S. Ct. at 1921. The substantiality of the underlying IATC claim is based on the same standard for granting a COA. *Martinez*, 566 U.S. at 14. We have already issued a COA on that issue, so we assume that requirement is satisfied. *See Trevino*, 829 F.3d at 356. We further assume, without deciding, that Trevino's state habeas counsel was ineffective.

## III.

Trevino's IATC claim fails, because he has not shown that he was prejudiced by the mitigation investigation of his trial counsel.[2] To prove

---

[1] In granting the COA, we stated that not only were these issues debatable, but "reasonable jurists would agree that the district court erred" by dismissing Trevino's FASD claims. *Trevino*, 829 F.3d at 356. That statement is not binding on this panel, because a merits panel is not bound by a motions panel. *See Newby v. Enron Corp.*, 443 F.3d 416, 419 (5th Cir. 2006). Furthermore, we cannot be bound by a merits holding in a COA decision, because "until a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). We review Trevino's petition on the merits unbound by the COA opinion's observations on the merits.

[2] *See Strickland v. Washington*, 466 U.S. 668, 700 (1984) ("Failure to make the

prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[3] For mitigation-investigation claims, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Our merits discussion is limited by the COA to "potential evidence of FASD," including "lay witness testimony, such as personal and family history interviews relevant to a possible FASD diagnosis, that might otherwise have been excluded as character witness testimony" as to which a COA was denied. *Trevino*, 829 F.3d at 356.

Trevino has come forward both with evidence that he suffers from FASD and with additional lay testimony that he alleges would provide context for the FASD evidence. He has three experts who report that he suffers from FASD. Dr. Rebecca H. Dyer, Ph.D., is a clinical and forensic psychologist with Forensic Associates of San Antonio. She spent twelve and one-half hours interviewing Trevino and administering nine psychological tests. She also interviewed potential mitigation witnesses, including Trevino's mother, and reviewed some of the federal habeas record. She determined that "his clinical presentation and the psychological test results are consistent with the characteristics of FAE." His condition "would not have significantly interfered with his ability to know right from wrong, or to appreciate the nature and quality of his actions at the time of the capital offense." But the effect of FASD "on his cognitive development, academic performance, social functioning, and overall adaptive

---

required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

[3] *Id.* at 694.

functioning," in combination with his difficult family history, "would . . . have impacted any of Mr. Trevino's decisions to participate in or refrain from any activities that resulted in his capital murder charges . . . ."

Mitigation expert Linda Mockeridge interviewed seven witness and reviewed some of the record. She also reached the conclusion that Trevino demonstrated signs of FASD. She confirmed that Trevino's mother drank heavily and that he suffered developmental delays, struggled in school, and was easily angered. She recommended additional testing be done on Trevino to determine the extent of the damage to his brain that she believed FASD had caused. Dr. Paul Conner, Ph.D., a clinical neurologist, was brought in to conduct some of the testing recommended by Mockeridge. In the email summary of his findings, Conner found that Trevino demonstrated deficiencies in eight cognitive domains, where only three are necessary for a diagnosis of FASD. He concluded that Trevino's "daily functioning skills are essentially at a level that might be expected from an individual who was diagnosed with an intellectual disability."

To contextualize his FASD evidence, Trevino includes affidavits from multiple family members with his second amended petition.[4] His mother, Josephine Trevino, discussed how she "would usually drink 18 to 24 cans of Budweiser, every day during [her] pregnancy with Carlos." Trevino weighed only four pounds at birth and remained in the hospital until he gained weight. She explained that Trevino suffered significant injuries as a child, hitting his head on a piano and being hit by a car and thrown into a street light.

---

[4] The district court acknowledged that several of the affidavits and reports attached to Trevino's second amended petition are unsigned and unauthenticated. *Trevino*, 2015 WL 3651534, at *7 n.4. In evaluating the mitigating evidence, the court decided to take into account those documents "[o]ut of an abundance of caution," and we do the same. *Id.*

No. 15-70019

Janet Cruz, Trevino's ex-girlfriend, states that he was a good father and caring toward her, but was easily influenced by his friends. She also describes occasions on which Trevino was violent toward her. Cruz claims that he had physical altercations with both her and his mother, he once put a gun to Cruz's head, he attempted to rape her at knife point, and she "was always fearful of him." Peter Trevino, Trevino's brother, alleges that he witnessed Trevino be physically violent toward Cruz, including choking her.

Robert Gonzalez, Trevino's former employer, comments that Trevino "has never been involved in violence" and that he was a good worker that lacked initiative. Mario Cantu, an old friend of Trevino's, states that he was a follower and "was a peaceful person and he was not violent." But Cantu also acknowledges that he knew Trevino "had firearms and was part of a street gang," and two weeks after he was released on parole Trevino went out with friends "getting high and drunk and robbing people." Jennifer DeLeon, Trevino's sister, describes the difficulty that he had in school, including repeating some grade years. His academic problems are also demonstrated in Dyer's mitigation report.

This new mitigation evidence is insufficient to create a reasonable probability that Trevino would not have been sentenced to death had it been presented to the jury. Unlike in *Wiggins*, 539 U.S. at 537, where the Court held trial counsel was ineffective, Trevino's trial counsel did present mitigating evidence from Trevino's life history. "Wiggins' sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions." *Id*. Trevino's trial counsel presented a mitigation witness, his aunt, who covered his mother's alcohol problems, his absent father, his trouble in school, and the love he demonstrated toward her daughters. The prosecution presented aggravating evidence that he had a juvenile criminal record, adult convictions for

8

No. 15-70019

DUI, burglary of a vehicle, and burglary of a building and had joined a violent prison gang.

We review that evidence along with all of the new evidence that Trevino has presented to determine whether the outcome of the punishment hearing was prejudiced. *Id.* at 534. The mitigating evidence that Trevino suffers the effects of FASD would be heard along with Cruz's graphic testimony of Trevino's violence toward her and Cantu's testimony that he was involved in gang and criminal activity. The FASD evidence itself is also undermined by Dyer's conclusion that Trevino's FASD "would not have significantly interfered with his ability to know right from wrong, or to appreciate the nature and quality of his actions at the time of the capital offense."

This is a significant double-edged problem that was not present in *Wiggins*.[5] Jurors could easily infer from this new FASD evidence that Trevino may have had developmental problems reflected in his academic problems and poor decisionmaking, but that he also engaged in a pattern of violent behavior toward both Cruz and Salinas that he understood was wrong. Taking all of the evidence together, we cannot say this new mitigating evidence would create a reasonable probability that the outcome of Trevino's sentencing would have been different.

The judgment denying habeas relief is AFFIRMED.

---

[5] *Wiggins*, 539 U.S. at 535 ("Wiggins' history contained little of the double edge [the Court] ha[s] found to justify limited investigations in other cases."). The Court cited *Burger v. Kemp*, 483 U.S. 776, 794 (1987), and *Darden v. Wainwright*, 477 U.S. 168, 186 (1986), for examples of double edged evidence preventing a finding of prejudice. *Wiggins*, 539 U.S. at 535. In *Burger*, the petitioner's new family history evidence included encounters with the police that had not been previously disclosed as well as evidence of his erratic, violent tendencies. *Burger*, 483 U.S. at 794. In *Darden*, 477 U.S. at 186, presenting mitigation evidence would have allowed the introduction of the petitioner's prior convictions, including for rape, and a psychiatric report that determined he was capable of committing the crime. The double edge of Trevino's new evidence is analogous to these cases.

No. 15-70019

JAMES L. DENNIS, Circuit Judge, dissenting:

During the penalty phase of Carlos Trevino's capital murder trial, his defense counsel put on a single mitigation witness, his aunt, who in testimony that filled only five pages of trial transcript stated little more than that Trevino's mother had alcohol problems and was living in nearby Elgin, Texas; that Trevino had dropped out of high school; and that she thought that he was incapable of capital murder. Defense counsel had not previously located or talked to Trevino's mother, nor did counsel introduce any other mitigating evidence. After hearing only this and the State's aggravating evidence, the jury found that Trevino had failed to demonstrate sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole. As a result, he was sentenced to death.

During federal post-conviction proceedings, Trevino's federal habeas counsel contacted Trevino's mother in Elgin, Texas, and learned from her that during her pregnancy with Carlos she drank between eighteen and twenty-four bottles of beer every day. Counsel hired three experts who developed substantial evidence that Trevino suffers from fetal alcohol spectrum disorder (FASD), a condition that results from a child's *in utero* exposure to alcohol during his mother's pregnancy and which can cause brain damage and resulting impairments in behavioral and cognitive functioning.[1] Trevino

_____

[1] FASD is an umbrella term used to define a broad range of effects and symptoms caused by prenatal alcohol exposure. According to the National Institute on Alcohol Abuse and Alcoholism at the National Institutes of Health,

> Each individual with FASD experiences a unique combination of day-to-day challenges that may include medical, behavioral, educational, and social problems. People with FASD may have difficulty in the following areas: learning and remembering, understanding and following directions, shifting attention, controlling emotions and impulsivity, communicating and socializing, [and] performing daily life skills, including feeding, bathing, counting money, telling time, and minding personal safety. FASD-related brain damage makes it difficult to address routine life situations. It causes

argues that his trial counsel was constitutionally ineffective in failing to conduct a reasonably thorough mitigation investigation, to discover evidence that he suffered from FASD, and to present this powerful mitigating evidence to the jury, and he asks this court to reverse the district court's dismissal of his claim, vacate his death sentence, and grant him a new penalty trial. I believe that he is entitled to this relief. Had trial counsel conducted a reasonably competent investigation, discovered that Trevino suffered from FASD, and presented evidence of his condition to the jury, there is a reasonable probability that the result of the penalty phase would have been different, viz., that at least one juror would have voted against imposing a death sentence.[2] *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *see also Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

A majority of the current panel comes to the contrary conclusion and denies Trevino relief on the merits, holding that trial counsel's failure to investigate, discover, and present evidence of Trevino's FASD during the penalty phase did not prejudice his case. To reach this conclusion, the majority opinion misapplies controlling precedent and misconstrues the relevant evidence. Because a proper application of Supreme Court and Fifth Circuit decisions to the facts of this case plainly lead to the conclusion that Trevino

---

people to make bad decisions, repeat the same mistakes, trust the wrong people, and have difficulty understanding the consequences of their actions.

NAT'L INST. ON ALCOHOL ABUSE & ALCOHOLISM, FETAL ALCOHOL EXPOSURE (April 2015), https://pubs.niaaa.nih.gov/publications/fasdfactsheet/fasd.pdf.

[2] Indeed, a previous panel of this court unanimously granted a certificate of appealability (COA) to Trevino, concluding that "not only . . . [could] reasonable jurists . . . debate whether the district court erred in dismissing his FASD claim but . . . reasonable jurists *would agree* that the district court erred by doing so." *Trevino v Davis*, 829 F.3d 328, 356 (5th Cir. 2016) (emphasis added).

was prejudiced by his trial counsel's deficient penalty-phase performance, I respectfully dissent.

\*

As an initial matter, in this case we must apply de novo review because no state court adjudicated Trevino's claim of penalty-phase ineffective assistance of counsel on the merits. *See* § 2254(d); *Cone v. Bell*, 556 U.S. 449, 472 (2009). As a result, we must squarely consider whether Trevino is entitled to relief under *Strickland* and its progeny. We cannot shield our decision under the "deference and latitude" afforded by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), as they "are not in operation when the case involves review under the *Strickland* standard itself." *See Harrington v. Richter*, 562 U.S. 86, 101 (2011).

"As with all claims for ineffective assistance of counsel, relief based on an insufficient mitigation investigation requires a showing of both deficient performance and prejudice." *Loden v. McCarty*, 778 F.3d 484, 498 (5th Cir. 2015) (citing *Porter v. McCollum*, 558 U.S. 30, 38 (2009)); *see also Strickland*, 466 U.S. at 688, 694. Trevino asserts that his trial counsel's performance was unconstitutionally deficient because counsel failed to conduct a reasonably thorough mitigation investigation, to discover evidence that Trevino suffers from FASD, and to present this mitigating evidence to the jury. FASD occurs in persons who suffer heavy prenatal exposure to alcohol. Persons with FASD typically demonstrate cognitive, academic, attentional, and behavioral deficiencies. The majority opinion does not dispute that Trevino has established that counsel rendered deficient performance in failing to perform a thorough mitigation investigation and to introduce FASD evidence, and rightly so. *See Trevino v. Davis*, 829 F.3d 328, 349–51 (5th Cir. 2016) (discussing deficiency under *Strickland* and concluding that, "[g]iven that

Trevino's life was on the line, reasonable jurists would consider the mitigation investigation conducted by his trial counsel insufficient").

Next, Trevino argues that evidence of his FASD would have established a sufficient mitigating factor that was reasonably likely to have changed the outcome of his sentencing. In order to establish that his attorney's deficient performance in the penalty phase of a capital case prejudiced his defense, a petitioner must show that there is a reasonable probability that, but for the relevant deficiencies, at least one juror would have voted against imposing a death sentence. *See Wiggins*, 539 U.S. at 537; *see also Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

In support of his claim, Trevino has presented expert and lay witness testimony pertaining to his FASD, including a 2004 report by Dr. Rebecca Dyer, a clinical and forensic psychologist. Dyer stated that "individuals with histories of significant prenatal exposure to alcohol have been shown to present with deficits in adaptive behavior, poor judgment, attentional deficits, and other cognitive deficits throughout childhood, adolescence and into adulthood, which is not the finding in individuals with other childhood difficulties," and noted that "the deficits found in [FASD] children tend to become more debilitating as these individuals get older." Dyer conducted a number of interviews, including with Trevino and his mother; administered nine psychological tests to Trevino; and reviewed Trevino's school and disciplinary records along with available medical records. Based on this evidence—none of which had been discovered by his state trial counsel—Dyer concluded that Trevino suffers from FASD: he functions "within the low average range of intellectual functioning" and has a "history of employing poor problem-solving

strategies, attentional deficits, poor academic functioning, memory difficulties, and history of substance abuse."

Turning to the relevance of her diagnosis to Trevino's conviction and sentence, Dyer stated:

> [Trevino's] history of [FASD] clearly had an impact on his cognitive development, academic performance, social functioning, and overall adaptive functioning. These factors, along with his significant history of physical and emotional abuse, physical and emotional neglect, and social deprivation clearly contributed to [Trevino's] ability to make appropriate decisions and choices about his lifestyle, behaviors and actions, his ability to withstand and ignore group influences, and his ability to work through and adapt to frustration and anger.

She concluded that Trevino's FASD "would . . . have impacted any of [his] decisions to participate in or refrain from any activities that resulted in his capital murder charges."

Dr. Paul Connor, a licensed psychologist and neuropsychologist, also conducted testing on Trevino. Connor found that Trevino demonstrated deficits in eight domains: academics, especially math; verbal and visuospatial memory; visuospatial construction; processing speed; executive functioning, especially on tasks that provide lower levels of structure and as such require greater independent problem solving or abstraction skills; communication skills, especially receptive skills; daily living skills, primarily "community skills"; and socialization skills. Based on his initial findings, Connor concluded that Trevino's "daily functioning skills are essentially at a level that might be expected from an individual who was diagnosed with an intellectual disability."

This expert evidence is supported and contextualized by lay witness testimony, compiled by mitigation expert Linda Mockeridge, that includes details as to how FASD adversely affected Trevino's mental and social development. Specifically, Mockeridge collected testimony establishing that

Trevino's mother drank between eighteen and twenty-four beers a day while pregnant with Trevino; that Trevino weighed only four pounds at birth and had to stay in the hospital for several weeks until he reached five pounds; that Trevino's developmental milestones were significantly delayed compared to his siblings; that Trevino was not potty-trained until he was six years old and wore pampers at night until he was eight years old; that Trevino repeated several grades in elementary school and ultimately dropped out of school in ninth grade, at which point he was reading at a third-grade level; that Trevino was "a follower" and acted impulsively; and that Trevino got angry easily.

"'To assess the probability of a different outcome under *Strickland*, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.' . . . In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation." *Sears*, 561 U.S. at 955–56 (quoting *Porter*, 558 U.S. at 40–41 (alterations omitted); *see also Wiggins*, 539 U.S. at 534.   We therefore must measure the evidence of Trevino's crime and other aggravating factors presented to the jury by the State against both the mitigation evidence adduced at trial and the significant new evidence, adduced in the federal habeas proceeding, which contextualizes his criminal history.

Taken together, the newly proffered mitigation evidence establishes that the effects of FASD diminished Trevino's ability to resist external influences and to evaluate the consequences of his actions.  Significantly, it shows that FASD, a condition caused by conduct outside of Trevino's control, specifically influenced the decision-making that led him to join others in committing a capital offense.  This evidence, "taken as a whole, 'might well have influenced

the jury's appraisal' of [Trevino's] culpability, and the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (first quoting *Wiggins*, 539 U.S. at 538, then quoting *Strickland*, 466 U.S. at 694); *cf. Williams v. Taylor*, 529 U.S. 362, 398 (2000) (knowledge that petitioner's childhood was "filled with abuse and privation" and that he was "'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability"); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

The majority opinion offers two related reasons for avoiding this necessary conclusion. First, it notes that Trevino's counsel did present the jury with some mitigating evidence, viz., the brief testimony of Trevino's aunt. Op. at 8. Although this is true, it does not lessen the tendency of the previously unpresented FASD mitigating evidence to persuade the jury to view Trevino as less morally culpable. An attorney's constitutionally deficient performance is not rendered harmless merely because he presented a superficial mitigation case. *See Sears v. Upton*, 561 U.S. 945, 954 (2010) ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented."). Thus, the majority opinion's argument is meritless.

Second, the majority opinion asserts that Trevino's previously undiscovered FASD evidence suffers from a "significant double-edged problem," op. at 9, arguing that it has both aggravating and mitigating effects and that the failure to introduce it therefore could not have prejudiced Trevino. The majority mistakenly relies on *Burger v. Kemp*, 483 U.S. 776 (1987), and *Darden v. Wainwright*, 477 U.S. 168 (1986), two cases in which the Supreme Court rejected claims of ineffective assistance of counsel based on counsel's decision to not develop and present certain mitigating evidence because of fears that it contained detrimental elements that would harm the defendant's case. Initially, it must be clarified that, contrary to the majority opinion's statement that these cases are "examples of double edged evidence preventing a finding of prejudice," op. at 9 n.5, both *Burger* and *Darden* were in fact decided on the deficiency prong of *Strickland*. In both cases, defense counsel, after conducting a reasonably competent investigation, opted not to develop and present mitigation evidence that would have opened the door for the prosecution to present damaging evidence to the jury. *Burger*, 483 U.S. at 794–95; *Darden*, 477 U.S. at 186. And in both cases, the Court found that counsel's strategic decisions were entitled to substantial deference and thus did not constitute deficient performance under the first prong of *Strickland*. *Burger*, 483 U.S. at 794–95; *Darden*, 477 U.S. at 186.

Under *Strickland*, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). As this court has observed, "the fact that an attorney reached the wrong conclusion does not necessarily make his performance deficient." *United*

*States v. Freeman*, 818 F.3d 175, 178 (5th Cir. 2016).  The Supreme Court's determination in *Burger* and *Darden* that counsel's decision not to present certain mitigation evidence on the grounds that it might undermine another defense strategy was "professionally reasonable" therefore has no bearing on the distinct question presented here of whether there is a reasonable probability that, had mitigation evidence been presented, the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 694.  To the extent that the majority opinion relies on *Burger* and *Darden*, its argument must therefore fail.

Further, the majority opinion exaggerates the potential aggravating impact of Trevino's FASD evidence.  Although some of the new lay-witness testimony includes potentially aggravating statements about Trevino's past conduct, evidence of a similar nature had already been presented by the State during the penalty phase;[3] additional, cumulative references to these negative factors would thus be of marginal relevance to the jury.  The majority opinion also points to Dyer's statement that Trevino's FASD "would not have significantly interfered with his ability to know right from wrong, or to appreciate the nature and quality of his actions at the time of the capital offense" as potentially aggravating.  Op. at 9.  But the jury would have found this testimony by Dyer to merely state the obvious, as Trevino did not assert an insanity defense and the same jury had already found him guilty of the offense.  By focusing on this statement, the majority opinion elides the much

---

[3] Specifically, the majority opinion notes that the new evidence shows that although Trevino was a good father and employee, he had also been abusive toward his girlfriends, possessed firearms, was in a street and prison gang, and abused drugs and alcohol.  Evidence that Trevino was at times prone to violence, was associated with a gang, and had previous drug convictions had already been presented by the State during the penalty phase.

more significant part of Dyer's testimony: that FASD "clearly had an impact on [Trevino's] cognitive development, academic performance, social functioning, and overall adaptive functioning" and that "[t]hese deficits would . . . have impacted . . . [his] decisions to participate in or refrain from any activities that resulted in his capital murder charges."

Even if the mitigation evidence Trevino offers were meaningfully double-edged, that would not foreclose his claim for relief.  Both the Supreme Court and this court have found that previously unpresented evidence indicating reduced moral culpability was sufficient to establish prejudice even when such evidence also had a potential aggravating effect.  For example, in *Williams*, despite significant aggravating evidence, the Supreme Court found that newly proffered evidence of mistreatment, abuse, and neglect during the petitioner's early childhood, as well as testimony that he was "borderline mentally retarded," might have influenced the jury's appraisal of the petitioner's moral culpability.  529 U.S. at 398.  The Court noted that although "not all of the additional evidence was favorable," *id.* at 396, the mitigation evidence reinforced the notion that the petitioner's violent behavior "was a compulsive reaction rather than the product of cold-blooded premeditation," and explained that "mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case," *id.* at 398.  Similarly, although the FASD evidence may not have affected the jury's finding as to Trevino's future dangerousness, it nevertheless would have provided insight into his motivations and state of mind and, in so doing, "might well have influenced the jury's appraisal of his moral culpability." *See id.*

In *Rompilla*, the Supreme Court considered new mitigation evidence that included prison files documenting "a series of [juvenile] incarcerations . . .

often of assaultive nature and commonly related to over-indulgence in alcoholic beverages," as well as "test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders," "test scores showing a third grade level of cognition after nine years of schooling," and evidence of childhood abuse and severe privation. 545 U.S. at 391–92. Despite what the majority opinion would undoubtedly call the "double-edged nature" of this evidence, the Court concluded, "It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [the petitioner's] culpability.'" *Id.* at 393 (quoting *Wiggins*, 539 U.S. at 538). I see no reason why the evidence offered by Trevino would not have had the same effect.

Finally, in *Neal v. Puckett*, 286 F.3d 230, 243–44 (5th Cir. 2002) (en banc), despite our recognition that some of the proposed mitigating evidence that Neal sought to introduce might be considered "double-edged," we concluded that "with a more detailed and graphic description and a fuller understanding of [the defendant's] pathetic life, a reasonable juror may have become convinced of [his] reduced moral culpability."[4] In the same way, a fuller description of Trevino's life that included his struggles with FASD may have convinced a reasonable juror of his "reduced moral culpability" even if parts of that description could be characterized as "double-edged." *See id.*

The reasoning undergirding *Williams*, *Rompilla*, and *Neal* strongly supports the conclusion that Trevino suffered prejudice as a result of trial

---

[4] The en banc court ultimately denied relief to Neal, concluding that under the deferential standard of 28 U.S.C. § 2254(d), it could not say that the Mississippi Supreme Court unreasonably applied *Strickland*. *Neal*, 286 F.3d at 243. Nevertheless, had the court not been constrained by § 2254(d), as is the case here, it would have concluded that there was a reasonable probability that a single juror would have been swayed. *Id.* at 244.

counsel's failure to conduct a reasonably thorough mitigation investigation, to discover evidence that Trevino suffers from FASD, and to present this mitigating evidence to the jury. The FASD evidence and supporting lay witness testimony put Trevino's life and his juvenile and criminal history in context and help to explain his conduct. "[A]lthough . . . it is possible that a jury could have heard [the additional mitigation evidence] and still have decided on the death penalty, that is not the test." *Rompilla*, 545 U.S. at 393. The question before this court is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Had the jury heard about the existence, origin, and effects of Trevino's FASD, it is difficult not to conclude that "there is a reasonable probability that at least one juror would have struck a different balance." *See Wiggins*, 539 U.S. at 537.

I respectfully dissent.